IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Mountain Top Beverage Group, Inc. | : | |
| | : | Case No. C-1-01-832 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER |
| Wildlife Brewing N.B., Inc. *et al.* | : | |
| | : | |
| Defendants | : | |

This matter comes before the Court on Defendants Wildlife Brewing N.B., Inc. ("Wildlife")

and James Sorenson ("Sorenson")'s Motion for Summary Judgment Against Plaintiff and Third-

Party Defendants (doc. #32) and on Defendant Pittsburgh Brewing Co. ("PBC")'s Motion for

Summary Judgment (doc. #22).   All defendants ask the Court to find that Plaintiff Mountain Top

Beverage Group, Inc. ("Mountain Top")'s federally registered trademark is invalid and that they are

thus not liable to Mountain Top on Mountain Top's federal claims of trademark infringement and

false designation of origin, nor on Mountain Top's related state law claims of deceptive trade

practices, tortious interference with economic relations and unfair competition.   Additionally,

Defendants Wildlife and Sorenson ask the Court to find that Mountain Top and Third-Party

Defendant B.L.S. of Sarasota ("BLSS") are liable to Wildlife on a federal false designation of origin

claim and related state and common law claims of trademark infringement, unfair competition,

dilution of mark, tarnishment and injury to business reputation, unfair business practices, deceptive

trade practices, and tortious interference with a contract and business relationship.   For the reasons

set forth below, Defendant PBC's motion is **GRANTED**.   Defendants Wildlife and Sorenson's

motion is **GRANTED IN PART** and **DENIED IN PART**.

I.    **FACTUAL BACKGROUND**

This case involves the manufacture and sale of competing malt liquor products bearing the name "Wildcat."  On July 19, 1993, Third-Party Defendant BLSS filed an Intent to Use trademark application ("ITU application") with the United States Patent and Trademark Office ("USPTO") to register "X 40 Wildcat" as a trademark on the USPTO's Principal Register in connection with beer and malt liquor.  (Doc. #32, exh. JJ.)    An ITU application allows a trademark applicant to begin the federal registration process without actually using the mark at the time of application.  See 15 U.S.C. § 1051(b).  The USPTO then issues a Notice of Allowance stating that a mark is in compliance with formalities and is registrable.  Within six months an ITU applicant must file a Statement of Use ("SOU") and specimen or facsimile of the mark in order to successfully register its trademark.  The applicant may request and receive a number of extensions of time in which to file the SOU, so long as the SOU issues no later than thirty-six months after the Notice of Allowance.  See 15 U.S.C. § 1051(d)(2).  The SOU is a verified statement that the mark is in use in commerce, specifying the date on which the mark was used in commerce, the goods in connection with which the mark was used, and the manner in which the mark is used in connection with the goods.  See 15 U.S.C. § 1051(d)(1).  Subject to examination of the SOU, the mark is then registered on the Principal Register.  Id.  On August 28, 2000, the last possible day in which BLSS could file its SOU without abandoning its trademark application, BLSS filed its SOU to register the Wildcat mark, (doc. 34, exh. A at ¶ 16), and on November 13, 2001, "40 Wildcat" ("The Wildcat mark") was registered on the Principal Register of the USPTO.  (Id., exh. B.)

BLSS's SOU consisted of a photograph of a bottle with the mark affixed to it and the signed statement of Brady Skinner, president of BLSS, that "[a]pplicant is using the mark in commerce on

or in connection with the following goods: malt liquor in class 32.  The mark was first used at least as early as August 22, 2000, and first used in commerce at least as early as August 22, 2000. Applicant is using the mark in interstate commerce." (Doc. #32, exh. UU.)   The SOU provides no details as to how the mark was used, no information indicating whether there were any sales or interstate transportation of the goods, no details as to what quantity of the goods was produced, nor what revenue the goods had earned.

Defendants have established through depositions of Mountain Top personnel and through answers to interrogatories that from the 1993 filing date of the ITU application until the commencement of this action, neither Plaintiff nor its predecessor BLSS had made any sales of any products bearing the Wildcat mark, nor conducted any advertising or marketing of any products bearing the Wildcat mark.  (Doc. #32, exh. CC at question #4, #13).  Defendants have established that there are no items bearing the Wildcat mark being marketed, sold, distributed or otherwise provided by Plaintiff.  (Id. at question #16).  Although Plaintiff, as required by statute, enclosed an image of a Wildcat product in its SOU, a true sample of packaging that could be used on a product eligible for sale was not available until at least August 30, 2000 because the labels required by ATF were not approved until then.  (Doc. #32, Smith depo. at 70) (no distribution of beer and malt liquor products without ATF approval).  Further, Defendants have shown that Plaintiff had not yet contracted with a brewer to produce a Wildcat product at the time the SOU was filed, and the brewer with whom Skinner companies were in contact ("Frederick Brewing") could not even quote a price until September of 2000, let alone have produced a shipment of the actual brew.  (Doc. #32, exh. N) (production fees still in discussion by September 9, 2000).

There was no sale of goods bearing the Wildcat mark by any Skinner company until January 10, 2001, when Frederick Brewing Company sold a shipment to KABCo (Doc. #32, exh. T.)  The

shipment was later destroyed by one of the Skinner companies because Mountain Top did not want to sell its Wildcat product while Wildlife's Wildcat products were sold in the market. (Doc. #32, Smith depo. at 73). The interaction between BLSS, Mountain Top, KABCo and Heartland Distributing company is somewhat complicated, but suffice to say, all are solely owned or majority controlled by Brady L. Skinner.

The evidence shows that the Wildcat product shown in the SOU was a "dummy sample." Bert Smith, an operations employee of KABCo, testified in his deposition that a "dummy sample" of a Wildcat product was created and shown by local salespeople to retailers in the summer of 2000 although he couldn't be sure if the display actually occurred or by whom and to whom the sample might have been shown.    (Id. at 122-24.)   Smith clarified that he did not in fact know if a salesperson had ever shown the dummy sample.  (Id. at 123-24.)  Smith also testified that there was no chance that the dummy sample contained the actual brew to be sold.  (Id. at 261-63.)  He stated that there were no items bearing Wildcat marks marketed, sold, distributed, or otherwise provided by Mountain Top or BLSS.  (Doc. #32, Smith depo. at 222-24).  Brady Skinner, president of BLSS and majority shareholder of Mountain Top, testified that he personally never placed an order for any Wildcat product with David Snyder (the head of Frederick Brewing's parent company) (doc. #32, Skinner depo. at 65), and that Bert Smith would be the only other person authorized to do so.  (Id. at 67.)

In early 1999, while BLSS' ITU application to register its Wildcat mark was pending, BLSS learned that Defendants Wildlife and Sorenson were using the name "Wildcat" in connection with the manufacture and sale of either beer or malt liquor or both.  (Doc. #34, exh. A ¶ 12.)  Shortly thereafter, BLSS notified Defendants Wildlife and Sorenson of BLSS' ITU application and informed Wildlife and Sorenson that their use of the name Wildcat constituted infringement of BLSS' pending

Wildcat trademark. (Id. ¶¶ 13-14.)  After a second letter from BLSS to Wildlife and Sorenson in February of 2001, Wildlife and Sorenson responded in March of 2001 with a letter to BLSS asserting that Sorenson was the owner of the common law trademark "Wildcat" and any use of the mark Wildcat by BLSS would constitute infringement. (Id. at letters following exh. A.)

On December 3, 2001, BLSS assigned its Wildcat mark to Mountain Top. (Id., exh. D.) On December 5, 2001, Mountain Top commenced the instant action against Defendants Wildlife and Sorenson and against Defendant PBC, the company that manufactures Wildlife's Wildcat products, alleging federal claims of trademark infringement and false designation of origin, and related state law claims of deceptive trade practices, tortious interference with economic relations and unfair competition, and asking the Court to cancel Wildlife's Ohio state registration of the marks "Wild Cat Ice" and "Wild Cat Malt Liquor." Defendants Wildlife and Sorenson counterclaimed, alleging a federal claim of false designation of origin and related state and common law claims of trademark infringement, unfair competition, dilution of mark, tarnishment, and injury to business reputation, unfair business practices, deceptive trade practices, and tortious interference with a contract and business relationship. All Defendants seek cancellation of Mountain Top's trademark on the grounds that it was never "used in commerce."

## II.    STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56©). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).  For those issues on which the moving party will not have the burden of proof at trial, the movant must "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

Although "[t]he mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court should not grant summary judgment merely because the nonmovant's case appears weak.  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

**III.    ANALYSIS**

Because these two summary judgment motions require resolution of the same issues, the

Court will analyze them together.  In federal trademark infringement claims under 15 U.S.C. § 1114, "the touchstone of liability . . . is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997). Likewise, to succeed on a false designation of origin claim, a plaintiff must show that the false designation creates a "likelihood of confusion." Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998). Claims for trademark infringement and false designation of origin under the Ohio Deceptive Trade Practices Act and Ohio common law are subject to the same standards as their federal counterparts. See Daddy's Junky Music, 109 F.3d at 288.  Additionally, "[b]oth Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act." Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 626 n.2 (6th Cir. 2002).  See also Leventhal & Assocs., Inc. v. Thomson Cent. Ohio, 714 N.E.2d 418, 423 (Ohio Ct. App. 1998); Barrios v. Am. Thermal Instruments, Inc., 712 F. Supp. 611, 613-14 (S.D. Ohio 1988).

In the typical trademark case, a court conducts an eight factor test to determine whether a likelihood of confusion exists.  However, "whether alleging infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1), or infringement of an unregistered trademark, pursuant to 15 U.S.C. § 1125(a)(1) [false designation of origin], it is clear that a plaintiff must show that it has actually used the designation at issue *as a trademark*, and that the defendant has also used the same or a similar designation, *as a trademark*." Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods., 134 F.3d 749, 753 (6th Cir. 1998) (emphasis in original).  Therefore, the majority of Plaintiff's federal, state, and common law claims, and some of Defendants' claims, all turn on whether Mountain Top's federally registered Wildcat mark is valid under the Trademark Act of

1946 ("Lanham Act"), codified as amended at 15 U.S.C. § 1051 et seq..

This case involves three claims under the Lanham Act. Plaintiff asserts a claim of infringement under 15 U.S.C. § 1114,[1] and both Plaintiff and Defendants Wildlife and Sorenson assert claims of false designation of origin under 15 U.S.C. § 1125(a).[2] Both types of claims turn on the question of who owns the Wildcat mark. Registration of a trademark on the USPTO's Principal Register is prima facie evidence of the validity of the registered mark, of the registration of the mark, of the registrant's actual ownership of the mark, and of the registrant's exclusive right

---

[1]Under 15 U.S.C. § 1114,
(1) Any person who shall, without the consent of the registrant --
> (a) use in commerce any reproduction , counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
shall be liable in a civil action by the registrant for the remedies hereinafter provided.
15 U.S.C. § 1114(1).

[2] 15 U.S.C. § 1125(a) provides, in relevant part:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin or his or her or another person's goods, services, or commercial activities,
.shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act

to use the mark. 15 U.S.C. § 1057(b). The registration of Mountain Top's Wildcat mark established a presumption that it is valid. This presumption of validity, however, is rebuttable. See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590 (6th Cir. 1989); Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., 470 F.2d 975, 977 (6th Cir. 1972). In order to rebut the presumption of a registered trademark's validity, the party challenging the validity of the trademark must "put something more into the scales than the registrant." Aluminum Fabricating Co. v. Season-All Window Corp., 259 F.2d 314, 316 (2d Cir. 1958).

Defendants argue that Plaintiff Mountain Top's trademark is invalid as a matter of law because Mountain Top has failed to meet the use requirement of 15 U.S.C. § 1051(d)(1). "One of the bedrock principles of trademark law is that trademark . . . ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." Allard Enters., Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 356 (6th Cir. 1998) (quoting Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1105 (6th Cir. 1991) (internal quotations omitted)). 15 U.S.C. § 1127 defines "use in commerce" as a bona fide use of a mark in the ordinary course of trade, not a use made merely to reserve a right in a mark. The mark must be affixed to goods and sold or transported in interstate commerce.[3]

A.    **"Use in Commerce"**

The term "commerce," as used in § 1127 means interstate and foreign commerce. See

---

[3]15 U.S.C. § 1127 provides, in relevant part:
For purposes of this chapter, a mark shall be deemed to be in use in commerce --
(1) on goods when -
(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
(B) the goods are sold or transported in commerce . . .

McCarthy § 19:108.  Because the power of Congress to register a mark stems from the Commerce

Clause of the Constitution, a trademark must be used in interstate or foreign commerce as that is the

commerce Congress may lawfully regulate.  See U.S. Constitution, Art. I, § 8, cl. 3; see also Trade-

Mark Cases, 100 U.S. 82 (1879).  Defining "use" is significantly more problematic.  After the 1988

Trademark Law Revision Act ("TLRA") the quantum of use necessary to support a registration

changed.  Prior to the 1989 effective date of the TLRA, an applicant had to be using the mark in

commerce before applying for registration.  Requiring use as a foundation to registration meant

greater economic risk, so under that system, the quantum of use necessary to support a registration

was a "token use."  See McCarthy § 19:112.  A sale or transportation of a mark in commerce made

primarily to serve as a foundation for federal registration was a sufficient  "use" so long as the

transaction was bona fide and the applicant intended to continue using the mark.  See McCarthy §

19:113; Community of Roquefort v. Santo, 443 F.2d 1196 (C.C.P.A. 1971); L'il Red Barn, Inc. v.

Red Barn System, Inc., 322 F. Supp. 98 (N.D. Ind. 1970), aff'd 174 U.S.P.Q. 193 (7th Cir. 1972).

However, some uses fell below even the "token use" standard.  See, e.g. La Societe Anonyme

des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265 (2d Cir. 1974) (only eighty-nine bottles of

perfume sold over twenty years is a "meager trickle" which cannot create common law trademark

rights sufficient to preclude foreign importer waiting to enter U.S. market);  D. & M. Antique Import

Corp. V. Royal Saxe Corp., 311 F. Supp. 1261 (S.D.N.Y. 1969) (initial sale to personal friend

followed six years later by a $400 shipment held insufficient to support registration); Richardson-

Vicks, Inc. v. Franklin Mint Corp., 216 U.S.P.Q. 989 (T.T.A.B. 1982) (one sale of $1.27 followed

by no sales for four years is an impermissible "attempt to reserve a trademark"); Clairol, Inc. v.

Holland Hall Prods., 165 U.S.P.Q. 214 (T.T.A.B. 1970) (initial sale followed by two years of token

shipments of less than $1.00 per month to wholesalers, not customers, held insufficient).  See

generally McCarthy § 19:114.

Sales presentations, under certain circumstances, could meet the "token use" bar.  See Int'l
Mobile Machs. Corp., v. Int'l Tel. & Tel. Corp., 800 F.2d 1118 (Fed. Cir. 1986) (shipment of
prototype product to investor of applicant company for purposes of investor exploring own franchise
opportunities in product and for public demonstration to potential customers resulting in a sale held
sufficient).  However, when an applicant relied on a sales presentation to qualify as "transportation"
for "use in commerce" purposes, the trademarked product shown had to be "an actual product of the
nature for which registration is sought.  The shipment of sample packaging alone before the product
is in existence is insufficient and was held to not even constitute a token use by shipment of the
product."  McCarthy § 19:118 (citing Laboratoires du Dr. N.G. Payot Etablissement v. Southwestern
Classics Collection, Ltd., 3 U.S.P.Q.2d 1600 (Fed Cir. 1987)).

Even in a sale situation, if goods were contracted for and sold although they did not yet exist,
"until they are in actual physical existence the mark has not been 'used.'"  McCarthy § 119:118
(citing Richardson-Vicks, 216 U.S.P.Q. at 991-82 (T.T.A.B. 1982) (the goods to be identified by the
mark must be in existence at the time of the sale)).  Even under the "token use" standard, displaying
samples in bottles without the necessary labeling did not qualify as use.  In one oft-cited Seventh
Circuit case, a company gave out a few samples in bottles that did not have the labeling required for
sale to the public.  The Court held that "[s]uch transactions are the sort of pre-marketing maneuvers
that . . . cases hold insufficient to establish rights in a trademark."  Zazu Designs v. L'Oreal, S.A.,
979 F.2d 499, 505 (7th Cir. 1992).  A bona fide use in trade also requires that the mark "be affixed
to the merchandise actually intended to bear the mark in commercial transactions."  Blue Bell, Inc.
v. Farah Manufacturing Co., Inc. 508 F.2d 1260, 1267 (5th Cir. 1975).

The TLRA has eliminated such "token" uses to support trademark registration.  The TLRA

created ITU applications, which allow an applicant to apply to register a mark without first having used the mark in commerce, thereby eliminating the economic risks associated with pre-TLRA use-based applications. Consequently, in the post-TLRA era, mere "token" use is no longer sufficient to support federal trademark registration. See McCarthy § 19:110 (citing Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515, p. 44 (Sept. 15, 1988) (reproduced in McCarthy at Appendix A5.) The revised § 45 of the Lanham Act, 15 U.S.C. § 1127 states that "[t]he term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." The raised standard of use necessary to support federal registration of a trademark in the post-TLRA era is "entirely consistent with the traditional rules governing common-law ownership of trademarks." Allard Enterprises, 146 F.3d at 357. The Allard Court went on to explain, "In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition: the bona fide use of a mark in commerce that was not made merely to reserve a mark for later exploitation." Id. at 357. "The talismanic test for use in commerce remains whether or not the use was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Chere Amie v. Windstar, No. 01-cv-0040, 2002 WL 460065 at *4 (March 26, 2002, S.D.N.Y.) (quoting Marvel Comics Ltd. V. Defiant, 837 F.Supp. 546, 548 (S.D.N.Y. 1993)) (internal quotations omitted). The pre-TLRA cases are still instructive, however, because if a use does not meet the "token use"standard, then that use certainly will not rise to the level necessary to support today's federal trademark registration obtained through an ITU application.

### B.    Mountain Top's "Use in Commerce"

Mountain Top argues that Defendants have not met their burden of overcoming the presumption of validity of Mountain Top's mark because they have merely alleged the same set of

facts that the USPTO had before it when it deemed the mark registrable. (Doc. #26 at 11.) This

argument is unpersuasive. The USPTO received a bare allegation of use and a picture of a bottle with

the mark affixed to it. (Doc. #32, exh. UU). Defendants have satisfactorily rebutted the presumption

of validity of Mountain Top's mark by bringing forth significant evidence through depositions and

interrogatories that establishes that neither Plaintiff nor Third-Party Defendant BLSS has ever sold

or marketed any products bearing the Wildcat mark, and, in fact, BLSS had never even contracted

with a brewer to produce a Wildcat product at the time the SOU was filed.

Defendants' evidence is unrebutted: the only evidence of the "use in commerce" to which

BLSS swore in the 2000 SOU is a dummy sample of a Wildcat bottle containing liquid that was not

the actual Wildcat brew.   Neither Plaintiff Mountain Top nor Third-Party Defendant BLSS has

provided evidence -- whether by documents or testimony based on personal knowledge -- that the

dummy sample was ever shown to retailers. The only two individuals authorized to order production

of goods bearing the Wildcat mark (1) had no personal knowledge of the "use" and (2) did not place

any orders for goods bearing the Wildcat mark. Further, Bert Smith testified that there was no chance

that the dummy sample contained the actual brew to be sold. The evidence Mountain Top has

produced that it used the Wildcat mark in commerce therefore consists solely of the affadavit of

Brady Skinner, asserting a legal rather than factual conclusion, attached to the SOU.

Moreover, even if the display of the dummy sample actually *did* occur, showing samples in

bottles lacking the necessary labeling where the sample did not contain the merchandise actually

intended to bear the mark does not constitute "use" as a matter of law. Both Zazu and Blue Bell

indicate that such a display does not qualify as even "token use." Mountain Top has produced no

evidence by which a trier of fact could reasonably find it used the Wildcat mark. This Court finds that

Mountain Top does not satisfy the "use in commerce" requirement of federal trademark registration

as a matter of law.  This Court therefore orders the cancellation of Plaintiff's federally registered Wildcat trademark.  Because Plaintiff's federal trademark claims depends on its ownership of a valid trademark, those claims must fail.

Plaintiff also asserts a tortious interference with prospective economic relations claim.  "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 651 N.E.2d 1283, 1294 (Ohio 1995).  Taking the evidence in the light most favorable to Plaintiff, there is no evidence that Defendants purposefully induced a third party not to enter a contract or continue a business relationship with Mountain Top, nor that Mountain Top suffered any harm directly resulting from Defendants' actions.  Plaintiff's claims for tortious interference with prospective economic relations must therefore fail.  Because the rest of Plaintiff's claims depend on its ownership of a valid trademark, its remaining claims against Defendants Wildlife, Sorenson, and PBC must also fail. Defendant PBC's motion for summary judgment and the portion of Defendants Wildlife and Sorenson's motion for summary judgment on Plaintiff's federal claims of trademark infringement and false designation of origin, and state law claims of deceptive trade practices, tortious interference with economic relations and unfair competition are therefore **GRANTED**.

C.     **Wildlife and Sorenson's Claims Against Mountain Top**

In addition to asking for judgment as a matter of law on Plaintiff's claims, Defendants Wildlife and Sorenson also ask this Court to find that Plaintiff and Third-Party Defendant BLSS are liable to Defendants as a matter of law on a federal claim of false designation of origin and state and common law claims of trademark infringement, unfair competition, dilution of mark, tarnishment,

and injury to business reputation, unfair business practices, deceptive trade practices, and tortious interference with a contract and business relationship. Wildlife and Sorenson's argument for liability is unpersuasive.

Wildlife and Sorenson argue that Plaintiff's federally registered trademark should be cancelled because Plaintiff has not used the mark. Wildlife and Sorenson then allege a federal false designation of origin claim (and related state law claims)against Plaintiff and Third-Party Defendant BLSS. However, "the defendants' use of a protected mark or their use of a misleading representation is a prerequisite to the finding of a Lanham Act violation. Absent such a finding, the eight-factor test . . . is irrelevant." Holiday Inns, Inc. v. 800 Reservation, Inc. 86 F.3d at 626. State and common law claims of infringement, deceptive trade practices, and unfair competition follow the same analysis. This Court has found that neither Mountain Top nor its predecessor used the Wildcat mark as a matter of law, and Wildlife and Sorenson have not put forward any evidence to the contrary. A trier of fact could reasonably find that Mountain Top did not commit any trademark or unfair competition violation; summary judgment on these claims in favor of Wildlife and Sorenson is therefore not appropriate.

Wildlife and Sorenson also allege dilution of mark, tortious interference with contract and business relationship, and unfair business practices. To prevail on its dilution of mark claim, Defendants Wildlife and Sorenson must prove that its mark is famous, that Mountain Top is a junior user and that its conduct damages Wildlife and Sorenson's interest in its Wildcat mark by "blurring its product identification or by damaging positive associations that have attached to it." Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 424 (6th Cir. 1999). This Court has found that Mountain Top did not use the Wildcat mark as a matter of law. Wildlife and Sorenson have put forward no evidence to prove that Mountain Top's conduct damaged the mark or Wildlife and Sorenson's use of the mark.

15

Wildlife and Sorenson therefore have not made a showing that is "'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" Calderone v. United States, 799 F.2d at 259.  Summary judgment is therefore inappropriate on Wildlife and Sorenson's dilution claim.

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." A & B-Abell Elevator Co., 651 N.E.2d at 1294.  Wildlife and Sorenson have put forward no evidence to show that Mountain Top intentionally caused a breach in contract or business relationship between Wildlife and PBC nor that Wildlife and Sorenson suffered resulting damages.  Summary judgment in Wildlife and Sorenson's favor is therefore inappropriate.  Wildlife and Sorenson also ask for summary judgment on their claim that Mountain Top has violated the Ohio Unfair Business Practices Act, Ohio Revised Code § 1345 et seq.  A trier of fact could reasonably find that Mountain Top did not commit any unfair business practices; summary judgment on these claims in favor of Wildlife and Sorenson is therefore not appropriate.

The portion of Defendants Wildlife and Sorenson' motion for summary judgment on Plaintiff and Third-Party Defendant BLSS's liability to it under 15 U.S.C. § 1125(a) for false designation of origin and state and common law claims of trademark infringement, unfair competition, dilution of mark, tarnishment, and injury to business reputation, unfair business practices, deceptive trade practices, and tortious interference with a contract and business relationship is therefore **DENIED**.

IV.    **CONCLUSION**

Plaintiff Mountain Top has failed to use its Wildcat mark in commerce to support its federal registration.  Plaintiff's federal registration of its Wildcat mark is therefore cancelled, and Defendant

PBC's motion for summary judgment and the portion of Defendants Wildlife and Sorenson's motion for summary judgment on Plaintiff's claims are **GRANTED**.  Because this Court finds that Plaintiff has not used its Wildcat mark in commerce, the portion of Defendants Wildlife and Sorenson's motion for summary judgment on their federal and related state claims against Plaintiff and Third-Party Defendant BLSS is **DENIED**.

　　　　IT IS SO ORDERED.


　　　　　　　　　　　　　　　　　　___s/Susan J. Dlott_____
　　　　　　　　　　　　　　　　　　Susan J. Dlott
　　　　　　　　　　　　　　　　　　United States District Judge